UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| GLORIA DIX, | ) | Civil Action No.: 4:14-cv-0780-RBH-TER |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | |
| | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| CITY OF NORTH MYRTLE BEACH, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## I.     INTRODUCTION

This is an employment case.  Plaintiff alleges she suffered discrimination, retaliation and a hostile work environment because of her sex in violation of Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000(e) et seq.[1]   Presently before the court is Defendant's Motion for Summary Judgment (Document # 24).  All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(g), DSC.  This report and recommendation is entered for review by the district judge.

## II.     FACTS

Prior to seeking employment with Defendant City of North Myrtle Beach (the City), Plaintiff had many years of experience in procurement, contracting and buying.  Pl. Resume (Exs. A, B to Pl. Aff.).  After retiring from the Air Force, Plaintiff applied for a position with the City.  Pl. Aff. ¶ 6 (Ex. 1 to Pl. Response).  Plaintiff interviewed with and was hired by Joel Davis, the Assistant City Manager, as a buyer in the City's Purchasing Department in March 2007.  Pl. Dep. 41-42 (Ex. 1 to Def. Motion); Pl. Aff. ¶ 6.  As a buyer, Plaintiff was responsible for purchasing materials,

_____

[1]Plaintiff also originally alleged a claim for violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 et seq., but has since abandoned that claim.  See Pl. Dep. 108.

equipment, and services for the City's departments pursuant to the South Carolina Procurement Code. Pl. Dep. 50. When first hired, Plaintiff shared her duties with another buyer, Twyla Strevel. Pl. Dep. 48.

The City promoted Plaintiff to the position of support services supervisor on July 9, 2007. Pl. Dep. 53. In that position, Plaintiff was responsible for the direction and oversight of the activities and personnel of the Purchasing, Materials and Facilities, and Fleet Maintenance divisions. Pl. Dep. 54; Job Description (Ex. 4 to Def. Motion). Plaintiff also provided centralized purchasing and contracting support to all City departments for supplies, materials, and equipment, and she was responsible for reviewing all bid documents before release by the City. Pl. Dep. 62-63; Job Description.

Plaintiff's performance evaluation in January 2008 was completed by Joel Davis and covered approximately six months of the time she was in her new position of support services supervisor. Pl. Dep. 79-80; Jan. 2008 Evaluation (Ex. 5 to Def. Motion). The evaluation was generally positive, with scores of either meets expectations or exceeds expectations in all categories. Jan. 2008 Evaluation.[2] Nevertheless, Davis noted specific areas in which he expected improvement. Jan. 2008 Evaluation Comments (Ex. 6 to Def. Motion). In particular, Davis identified concerns in Plaintiff's interaction with staff and her attention to detail:

- "Need to make sure that prior to submitting contracts for review and approval that you have reviewed them carefully to ensure that they have all the proper provisions included in them."

- "[I]t is very important to make sure that items are procured exactly according to the specifications submitted by the respective departments, and based upon

---

[2]The rating scale provided five categories: substantially below expectations, below expectations, meets expectations, exceeds expectations, and substantially exceeds expectations. Jan. 2008 Evaluation.

the approved requisition."

- "Consistency is absolutely necessary in the area of procurement."

- "It is important to remember that although quantity is important, it is equally important to make sure that quality is not compromised as a result of trying to increase the quantity of work produced."

- "It is absolutely necessary for you to review bid documents to make sure that the[y] are accurate and grammatically correct prior to them being placed on the website or being sent out in hard copy."

- "I do expect you to improve in making sure that you carefully review purchase requisitions to ensure that items are procured in accordance with what is submitted in the requisition."

- "Need to improve in the area of not having to redo bid documents due to failure to carefully review them prior to distribution to vendors."

- "[M]ake sure that when you commit to completing a task by a specific time period, that you can meet the deadline that you commit to."

- "Make sure that you hold periodic staff meetings in order to keep your staff informed and to listen to their ideas and suggestions. Employees are more highly motivated when they are informed and are encouraged to offer their ideas and suggestions."

Jan. 2008 Evaluation Comments.

In January of 2009, Steve Thomas became the Assistant City Manager and Plaintiff's direct supervisor. Thomas Dep. 13, 19 (Ex. 2 to Pl. Response). Plaintiff's next performance evaluation occurred in March of 2009. March 2009 Evaluation (Ex. 7 to Def. Motion). Because Thomas had only recently been hired as Assistant City Manager, John Smithson, the City Manager, completed the review. Pl. Dep. 80-81; Thomas Dep. 40-41. Smithson rated Plaintiff's performance as below expectations in the categories of Leading, Employee Relations, Judgment, and Relationship with Others. March 2009 Evaluation. In all other categories she was rated as meets expectations, save one exceeds expectations rating. March 2009 Evaluation. Smithson noted that he had received

-3-

complaints about the time it takes for the requisition-to-buy process, and that Plaintiff needed to speed up that process.  1-9-08 to 1-9-09 Performance Evaluation Comments (Ex. 9 to Def. Motion). He also noted deficiencies in Plaintiff's interaction with staff:

- Plaintiff "may jump to another conclusion and the result can be damaging to the situation."

- Plaintiff's "interactions with staff are not always well thought out."

- "I am not sure [Plaintiff] always totally understands the problem or takes into account the multitude of varying ways a certain situation can turn out."

- "[Plaintiff] should show a willingness to listen and use her staff to move forward."

- "[Plaintiff] sometimes does not think through situations with her co-workers and jumps to conclusions or tries to use her position as boss to work through a problem she sees, when the problem may not be as bad or severe as it seems to her."

- "[Plaintiff] must develop a trust between her and the staff and she must be even in temperament and in the way she approaches a problem."

- "Don't do one thing for one and not the same to others. Do not lose your composure at any time."

- "[Plaintiff] must be fair and consistent at all times."

- "I sense conflict and relationships between [Plaintiff] and her co-workers that do not further the work effort."

- "I think [Plaintiff] must do a lot to improve the loyalty she receives from her staff."

- "[PLAINTIFF] ALSO MUST IMPROVE HOW SHE COMMUNICATES WITH STAFF."

- "Communication between [Plaintiff] and other departments must be appropriate and not argumentative."

1-9-08 to 1-9-09 Performance Evaluation Comments.

Within the next few months after the March 2009 Evaluation, Thomas asked Plaintiff to take

on the buying responsibilities of Twyla Strevel following her departure and felt that she could handle these responsibilities in addition to her supervisory duties.  In November of 2009, Thomas prepared a memorandum to Plaintiff entitled Work Performance Concerns.  Nov. 2009 Memo (Ex. 11 to Def. Motion). He stated that, while he was aware of some successes, he was "extremely disappointed" in her work performance overall, noting that she had made "several errors which could have potentially cost the city thousands of dollars or at the very least been embarrassing to the city as several of the errors involved city vendors and contractors."  Nov. 2009 Memo.  Those mistakes included requesting payment to a contractor for over $460,000 that had been paid six months earlier, requesting payment to an engineering firm for $265 that had been paid eight months earlier, requesting payment to a vendor for over $41,000 when 90% of the amount due had already been paid two months earlier, and submitting contracts for work prior to the notice of award being authorized by the City Manager, resulting in a contractor seeking payment from the City for costs incurred in preparation to fulfill the contract.  Nov. 2009 Memo; Pl. Dep. 87-88.

Thomas placed Plaintiff on a six-month probationary period to give her an opportunity to improve her performance. Nov. 2009 Memo. Thomas warned Plaintiff that he was concerned about her ability to supervise the support services division and be an effective buyer for the City. Nov. 2009 Memo. He warned her that further violations or errors could lead to additional discipline, up to and including termination. Nov. 2009 Memo. Thomas discussed the written reprimand with Plaintiff on November 2, 2009. Nov. 2009 Memo; Pl. Dep. 82.

Sometime in November of 2010, Plaintiff complained about Thomas to Mike Mahaney for his failure to properly perform his position and conduct her evaluations.  Pl. Aff. ¶ 25.  She also complained that he failed to return emails and phone calls.  Pl. Aff. ¶ 25.  Thomas explained to Mahaney that the delay in completing Plaintiff's probationary period evaluation was "due partly to

my hopes that performance would improve so I could recommend that the probationary period accomplished improved performance but this has not been the case." Select Dep. Ex. p. 17 (Ex. 7 to Pl. Response).

That same month, November of 2010, Thomas completed a probationary period evaluation of Plaintiff. Nov. 2010 Evaluation (Ex. 10 to Def. Motion). Thomas rated Plaintiff as substantially below expectations in guiding and influencing employees, instituting confidence in employees, employee relations, and interaction and communication with subordinates. Nov. 2010 Evaluation. Thomas rated Plaintiff as below expectations in communicating plans to employees, selecting manpower resources, properly disciplining employees, detailing assignments and responsibilities, showing confidence in employees, judging employee potential, making decisions analytically/deductively, initiating new ideas/innovations, acting as a catalyst for change, receiving support from subordinates, understanding of policies/procedures/standards, suggesting constructive change to policy, appraising impact of policy change, utilizing policy and procedures to meet goals, using judgment, anticipating consequences of decisions, working and communicating with co-workers, having to do work over again, wasting resources, understanding requirements of the job, doing work that is free from errors, and doing work that meets standards. Nov. 2010 Evaluation. The written narrative accompanying the evaluation points to specific examples of performance problems:

- "There continues to be numerous mistakes associated with contract documents including incorrect dates in renewal (Terrametrics), using the wrong type of contract for the acquisition (even though there were four or five samples on the share drive at one time) and forwarding to one contractor information intended for another."

- "There is not a week that goes by that I don't hear from one of [Plaintiff's] staff that they have found mistakes and corrected her work and they have long since given up trying to assist because she often takes it as an intrusion into her business."

-6-

- "I believe there has been on occasion an effort on [Plaintiff's] part to try to hide mistakes she has made (including shredding of the Waterworks information)."

- "The departments [Plaintiff] serves have largely lost faith in her ability to properly oversee the procurement of the services and equipment they need to operate effectively."

- "[Plaintiff's] staff lacks confidence in and respect for her and [Plaintiff] apparently suspects that her staff is working behind her back (I have found no evidence of this)."

- "I have also requested that [Plaintiff] work an eight hour day on average and not come in on weekends or holidays without my permission but she routinely ignores my requests."

11/2/09 to 5/2/10 Probationary Evaluation (Ex. 12 to Def. Motion).

As a result of Plaintiff's continued performance problems, Thomas demoted her to her former position as buyer effective November 29, 2010. 11/2/09 to 5/2/10 Probationary Evaluation; Pl. Dep. 93. He also reassigned her to handle smaller bidding and contracting, requisitions and purchase orders instead of the sealed bid and large contract responsibilities she had been handling. 11/2/09 to 5/2/10 Probationary Evaluation; Pl. Dep. 93. Those responsibilities went to Loy Williford. 11/2/09 to 5/2/10 Probationary Evaluation. Despite the demotion, Plaintiff maintained her same salary. Pl. Dep. 93. However, she was placed on probation for six months as is protocol in any new position. 11/2/09 to 5/2/10 Probationary Evaluation. After the demotion, the City reorganized the purchasing department for budgetary reasons and eliminated the position of support services supervisor. Pl. Dep. 72; Thomas Dep. 20; Williford Dep. 23 (Ex. 13 to Def. Motion).[3]

---

[3]A dispute of fact exists as to who became Plaintiff's supervisor following her demotion. Defendant states that Thomas remained Plaintiff's supervisor, until March of 2012 when Loy Williford was named Purchasing Agent and became Plaintiff's direct supervisor. Thomas Dep. 32; Williford Dep. 25. Plaintiff asserts that Williford became Purchasing Agent one week after she was demoted in November of 2010. Pl. Dep. 72. As set forth in detail below, the record reveals that Thomas completed Plaintiff's evaluations through September of 2012, while

Although Thomas hoped that by restoring Plaintiff to her former position with fewer responsibilities, her job performance would improve, see 11/2/09 to 5/2/10 Probationary Evaluation, he continued to observe the same problems with her performance.[4]  In the probationary period evaluation for the period between December 5, 2010, and May 5, 2011, Thomas noted the following performance problems in the narrative:

- improperly changing bids;

- ordering the wrong item for a department and leaving it to the department to correct the error;

- improper communication with contract bidders, which Plaintiff then denied;

- failure to send purchase orders and order items on time;

- ordering uniforms incorrectly, which required intervention to correct;

- ordering the wrong number of products;

- mishandling quotes and purchase orders with vendors;

- spending an inordinate amount of time working on a bronze plaque for the fire department;

- posting a job advertisement without HR approval; and

- printing and attaching dozens of sheets of paper to purchase orders, wasting both paper and resources.

12/5/10 to 5/5/11 Probationary Evaluation (Ex. 14 to Def. Motion).  Thomas noted his concern that Plaintiff "continues to commit many of the same types of errors that she committed in the

_____

Williford completed the evaluation in March of 2013.  Plaintiff testified that, at some point prior to her demotion, Thomas told her that Williford could do her job better for less money.  Pl. Dep. 78.  In emails from Plaintiff to Thomas dated March 29, 2011, and January 12, 2012, she acknowledged Thomas as her supervisor.  See Select Dep. Ex. pp. 19, 22 (Ex. 7 to Pl. Response).

[4]After Plaintiff's demotion, Thomas asked Williford to keep him informed of anything that might be out of line.  See Williford Dep. 53 (discussing an email dated 12/09/10).

supervisory position," and his concern about Plaintiff's difficulties working with others: "Many of [Plaintiff's] work related problems continue to result from her inability to consistently and effectively communicate, understand communications from others, and follow directives especially with respect to use of city resources . . . [Plaintiff] does not always get along well with her coworkers, even to the point of resisting their assistance in catching some of her mistakes." 12/5/10 to 5/5/11 Probationary Evaluation.

In the probationary evaluation for the period between May 5, 2011, to May 5, 2012, Thomas wrote that "[Plaintiff] continues to commit many of the same types of errors that noted in her previous, probationary evaluation due to many of the same factors and observations also outlined in the previous evaluation." 5/5/11 to 5/5/12 Probationary Evaluation (Ex. 16 to Def. Motion). Specifically, Thomas noted that Plaintiff continued to mishandle quotes, failed to receive sufficient bids, mishandled the purchase of gloves, continued to waste paper, posted a job without approval by human resources, and wrote an inappropriate email to the public information officer. 5/5/11 to 5/5/12 Probationary Evaluation.  Due to her continued performance problems and her inability to address those problems, Mr. Thomas recommended that the City extend Plaintiff's probationary period an additional six months, to March 12, 2013, and give her one last opportunity to improve. 5/5/11 to 5/5/12 Probationary Evaluation. But, Mr. Thomas warned Plaintiff that she would be immediately terminated if she made any work errors or mis-communications identified in her evaluations, failed to comply with directives from her supervisors, or failed to acknowledge errors. 5/5/11 to 5/5/12 Probationary Evaluation.

Thomas also completed another performance appraisal dated September 11, 2012.  Sept. 2012 Evaluation (Ex. 15 to Def. Motion).  Thomas rated Plaintiff as substantially below expectations in wasting the City's resources/supplies and below expectations in understanding the

technical/conceptual/interpersonal requirements of the job, doing work that is neat/in good order, doing work that is complete/error free, doing work that meets goals/standards, performs required amount of conceptual work, exercising judgment in routine/non-routine situations, anticipating consequences of decisions, and communicating with customers/external parties/supervisors. Sept. 2012 Evaluation.[5]

At some point[6], Loy Williford was named purchasing agent and became Plaintiff's supervisor. However, Williford made mistakes as well. He had typing errors in his work. Pl. Dep. 63. In September of 2010, Plaintiff reported to Thomas that Williford was signing purchase orders with his initials instead of his full name, but no disciplinary action was taken against him. Pl. Aff ¶ 24; Select Dep. Ex. p. 15 (Ex. 7 to Pl. Response). On August 15, 2012, Williford failed to include attachments to an email he sent Plaintiff. Pl. Aff. Ex. F. On August 17, 2012, he sent the same requisition to Plaintiff twice but forgot to include the attachments. Pl. Aff. Ex. F. On September 20, 2012, Williford failed to include quotes for two requisitions. Pl. Aff. Ex. F. In January of 2013, Williford asked his assistant to cancel the wrong purchase order, but Plaintiff caught the mistake before the order was canceled. Pl. Aff. ¶ 31. It is not clear whether anyone was aware of the mistakes noted by Plaintiff that occurred in 2012 and beyond, when Williford was supervising Plaintiff.

Williford's comments about Plaintiff to his coworkers via email indicate he was not fond of her:

---

[5]Although not entirely clear from the record, it appears that the 12/5/10 to 5/5/11 Probationary Evaluation, the 5/5/11 to 5/5/12 Probationary Evaluation and the September 2012 Evaluation were all drafted at the same time. Each was signed by Plaintiff on September 12, 2012.

[6]See footnote 3, supra.

- "You were not even at the stop sign before she was in your office looking at all the baskets."

- "I wonder if she is familiar with the term, 'does anybody really give a shit?'"

- "She just came down the hall and ask me did I have Larry Jones (printing by design) phone number. I wanted to tell her no, but the phone book does. I said Gloria it is in the contact list in Outlook. It actually took 10 minutes for her to get the 'I don't know what the shit you are talking about' look off of her face."

- "You would do all of us here a real favor if you could find it in your heart to talk to her about not dressing in her workout clothes and walk around with them on."

Select Dep. Ex. pp. 30, 31, 33, 34. Williford admitted that his comments were inappropriate, and

Thomas testified that sending these types of emails is an inappropriate use of the email system.

Williford Dep. 33-37, 39-42; Thomas Dep. 31.

On March 12, 2013, at the conclusion of Plaintiff's final probationary period, the City

evaluated Plaintiff's performance. 9/12/12 to 3/12/13 Probationary Evaluation (Ex. 17 to Def.

Motion). Williford conducted this evaluation, and he identified the same problems previously noted

by Thomas, including making wasteful copies, attaching unnecessary documents to purchase orders,

issuing multiple purchase orders to the same vendor rather than combining into one purchase order,

and failing to follow up on shipments from purchase orders. 9/12/12 to 3/12/13 Probationary

Evaluation. Williford also identified additional mistakes by Plaintiff, including:

- failing to submit purchase orders for requested items;

- failing to submit proofs of business cards to the department for review prior to approving them, resulting in printing errors on the final product;

- purchasing a stamp that said "FILE instead of "FILED" as requested;

- failing to use a state-wide contract vendor that offered a state contract price that was contrary to the procurement code and resulted in the City paying a higher price for the product;

- purchasing a container and a lid, adding $54.00 to the cost of the item when only a container was requested; and

- ordering 204 dozen items when the requisition from the department was for 204 items.

9/12/12 to 3/12/13 Probationary Evaluation. Because Plaintiff had been on probation for over two years yet continued to exhibit the same performance deficiencies, Williford recommended that she be terminated. 9/12/12 to 3/12/13 Probationary Evaluation. Thomas agreed with the recommendation and Mike Mahaney, the City Manager, also agreed.   Thomas Dep. 18-19, 39-40. The City[7] terminated Plaintiff's employment on March 14, 2013. Pl. Dep. 24.

## III.    STANDARD OF REVIEW

The moving party bears the burden of showing that summary judgment is proper.  Summary judgment is proper if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Summary judgment is proper if the non-moving party fails to establish an essential element of any cause of action upon which the non-moving party has the burden of proof.  Celotex, 477 U.S. at 322. Once the moving party has brought into question whether there is a genuine dispute for trial on a material element of the non-moving party's claims, the non-moving party bears the burden of coming forward with specific facts which show a genuine dispute for trial.  Fed.R.Civ.P. 56(e); Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986).  The non-moving party must come forward with enough evidence, beyond a mere scintilla, upon which the fact finder could reasonably find for it.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  The facts and

---

[7]Williford testified that Thomas made the decision to terminate Plaintiff.  Williford Dep. 45.  Thomas testified that Mahaney made the decision to terminate Plaintiff's employment. Thomas Dep. 18.

inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party. Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991). However, the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. Barber v. Hosp. Corp. of Am., 977 F.2d 872, 874-75 (4th Cir. 1992). The evidence relied on must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." Mitchell v. Data General Corp., 12 F.3d 1310, 1316 (4th Cir. 1993).

To show that a genuine dispute of material fact exists, a party may not rest upon the mere allegations or denials of his pleadings. See Celotex, 477 U.S. at 324. Rather, the party must present evidence supporting his or her position by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed.R.Civ.P. 56(c)(1)(A); see also Cray Communications, Inc. v. Novatel Computer Systems, Inc., 33 F.3d 390 (4th Cir. 1994); Orsi v. Kickwood, 999 F.2d 86 (4th Cir. 1993); Local Rules 7.04, 7.05, D.S.C.

## IV.    DISCUSSION

### A.    Scope of Charge of Discrimination

"Before filing suit under Title VII, a plaintiff must exhaust her administrative remedies by bringing a charge with the EEOC." Smith v. First Union Nat'l Bank, 202 F.3d 234, 247 (4th Cir.2000); see also 42 U.S.C. § 2000e–5(f)(1). The allegations contained in the administrative charge of discrimination generally limit the scope of any subsequent judicial complaint. King v. Seaboard Coast Line R.R., 538 F.2d 581, 583 (4th Cir.1976) (stating that a subsequent civil suit "may encompass only the 'discrimination stated in the [EEOC] charge itself or developed in the course of a reasonable investigation of that charge' ") (quoting Equal Employment Opportunity Comm'n v.

-13-

Gen. Elec., 532 F.2d 359, 365 (4th Cir.1976)); see also Smith, 202 F.3d at 247 ("A plaintiff's EEOC charge defines the scope of her subsequent right to institute a civil suit."). Only those claims stated in the initial administrative charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint may be maintained in a subsequent lawsuit. Evans v. Technologies Applications & Serv. Co., 80 F.3d 954, 963 (4th Cir.1996) (affirming the district court's dismissal of some of the plaintiff's claims because they were outside the scope of her original EEOC charge and were therefore time barred).

Plaintiff filed her Charge of Discrimination on April 4, 2013. Charge of Discrimination (Ex. 18 to Def. Motion). She alleged discrimination on the basis of sex, age[8], and retaliation. She stated that the discrimination took place between September of 2012 and March of 2013. Plaintiff agrees in her response that her claims are limited to the actions that took place after September of 2012.

**B.     Sex Discrimination**

Title VII makes it "an unlawful employment practice for an employer-(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin...." 42 U.S.C. § 2000e–2(a)(1). Plaintiff relies on the burden-shifting proof scheme established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

To establish a prima facie case of discrimination under Title VII, a plaintiff must show (1) she is a member of a protected class; (2) she was performing her job duties at a level that met her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) that

---

[8]As noted above, Plaintiff has abandoned her age discrimination claim. See footnote 1, supra.

-14-

similarly-situated employees outside the protected class received more favorable treatment. White v. BFI Waste Services, LLC, 375 F.3d 288, 295 (4th Cir.2004). The fourth element can also be met by showing other circumstances giving rise to a reasonable inference of unlawful discrimination. Miles v. Dell, Inc., 429 F.3d 480, 486–87 (4th Cir.2005).

If Plaintiff establishes a prima facie case, the burden shifts to Defendants to produce a legitimate, nondiscriminatory reason for the disparate treatment. Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). This is merely a burden of production, not of persuasion. St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

Once Defendants have met their burden of production by producing a legitimate, nondiscriminatory reason, the sole remaining issue is "discrimination vel non." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (citing Postal Service Bd. of Governors v. Aikens, 460 U.S. 711, 716, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983)). In other words, the burden shifts back to Plaintiff to demonstrate by a preponderance of the evidence that the legitimate reason produced by Defendants is not its true reason, but was pretext for discrimination. Reeves, 530 U.S. at 143. Throughout the burden shifting scheme set forth in McDonnell Douglas, the ultimate burden of proving that Defendants intentionally discriminated against Plaintiff remains at all times with Plaintiff. Plaintiff has the ultimate burden of presenting evidence from which a reasonable jury could conclude Defendants intentionally discriminated against her.

With respect to the initial prima facie showing, the City concedes Plaintiff's membership in a protected class and that she suffered an adverse employment action when she was terminated on

March 14, 2013.[9] However, it argues that Plaintiff has failed to show that her performance was satisfactory or that a similarly situated male employee received more favorable treatment. At the time of her termination, Plaintiff had been on probation since November of 2009, was demoted in November of 2010, and continued to receive progressively worse performance evaluations. Plaintiff submitted rebuttals to several of her performance evaluations (the evaluations submitted in March of 2009, November of 2009, November of 2010 and September of 2012). Pl. Aff. Ex. H. She provided explanations for a few of the errors described in her evaluations:

- In the memo entitled "Work Performance Concerns" dated November 2, 2009, Thomas noted that Plaintiff submitted contracts for work prior to the notice of award being authorized by the City Manager, resulting in a contractor seeking payment from the City for costs incurred in preparation to fulfill the contract. Plaintiff responded that the procedure had recently been changed and any costs incurred by the contractor were a result of the contractor's errors and not hers.

- In the same memo, Thomas noted that Plaintiff requested payment to a contractor who had already been paid. Plaintiff stated that the contractor improperly requested the payment after it had been paid.

- In the same memo, Thomas noted that Plaintiff failed to properly complete the bid process with respect to tires. Plaintiff stated that Thomas did not communicate the manner in which he wanted the process to occur until after she had already completed it.

- In the evaluation comments for the period between December 5, 2010, and May 5, 2011, Thomas noted a failure to order citation books in a timely manner, which Plaintiff rebutted by stating that the company from whom she was ordering did not fill the order in a timely manner and she had to follow-up with it to get the order filled.

Pl. Aff. Ex. H (Entry 35-4) pp. 6, 11, 13. However, the bulk of Plaintiff's rebuttals documented her disagreement with her supervisor's opinion of her work and her ability to supervise and otherwise

---

[9]As set forth above, Plaintiff does not claim that her demotion on November 29, 2010, was a result of discrimination.

work with others and her opinion of her abilities.  For example, Plaintiff made statements such as "[t]here have been quite a few changes to the procurement process since starting in July 2007 and as a supervisor I have handled them well," "I have good working relations with my staff and others in the departments," "I have and never will jump to conclusions on any issue as stated in my evaluation," and "I lead by example and help them to be a strong leader.  I have and always will be fair to all employees."  Pl. Aff. Ex. H (Entry 35-4) pp. 1, 2, 15.  "Whether an employee is performing at a level that meets legitimate expectations is based on the employer's perception, and [Plaintiff's] own, unsubstantiated assertions to the contrary are insufficient to stave off summary judgment." Morrall v. Gates, 370 F. App'x 396, 398 (4th Cir. 2010); King v. Rumsfeld, 328 F.3d 145, 149 (4th Cir. 2003) (holding "[Plaintiff's] own testimony, of course, cannot establish a genuine issue as to whether [Plaintiff] was meeting [the employer's] expectations.").

Plaintiff also points to some successes she had during her employment with the City.  She received overall positive performance evaluations in January of 2008 and March of 2009.  She saved the City thousands of dollars in 2009 when Twyla Strevel retired and Plaintiff took over her job responsibilities in addition to her own so that the City would not have to fill the position.  Pl. Aff. Ex. H (Entry 35-4) p. 10.  In 2011, she obtained over $28,000 in grant money to fund a project.  Pl. Aff. Ex. H (Entry 35-4) p. 5.  In 2011, she purchased a "tremendous amount of Toter containers . . . for the Public Works Department and Recyclables for the city and received on time to help get these in place for use."  Pl. Aff. Ex. H (Entry 35-4) p. 5.  However, the relevant time to evaluate an employee's performance is at the time of the adverse action, see Miles v. Dell, Inc., 429 F.3d 480, 485 (4th Cir.2005), which, here, occurred in March of 2013 when she was terminated.  While Plaintiff certainly has had successes during her career, the successes she notes occurred almost two years or more before her termination, and the City has documented multiple performance

-17-

deficiencies over almost four years, up to her termination.

Finally, "[a]n employer's expectations of its employees are considered 'legitimate' when they are honestly held; whether the employee agrees with those expectations is not the test." Addison v. CMH Homes, Inc., 47 F.Supp.3d 404, 420 (D.S.C. 2004) (adopting Report and Recommendation) (citing Thornley v. Penton Pub., Inc., 104 F.3d 26, 30 (2d Cir.1997). Here, Plaintiff has failed to present sufficient evidence to show otherwise. Plaintiff argues that none of the performance issues relied upon by the City were violations of the procurement code. However, it is outside the province of this court to find that an employer's expectations are not honestly held if they require more of an employee than simply following state law. See id. (citing Coco v. Elmwood Care, Inc., 128 F.3d 1177, 1179 (7th Cir.1997))(noting "it is no business of a court in a discrimination case to decide whether an employer demands 'too much' of his workers"); Anderson v. Westinghouse Savannah River Co., 406 F.3d 248, 272 (4th Cir.2005) (holding it is not appropriate for the court to "sit as a super-personnel department weighing the prudence of employment decisions made by the defendants"); Jiminez v. Mary Washington Coll., 57 F.3d 369, 377 (4th Cir.1995) (holding Title VII is not a vehicle for substituting the judgment of a court for that of the employer). In sum, based upon the evidence presented by Plaintiff, a reasonable juror could not find that she was meeting the City's legitimate expectations at the time of her termination. Accordingly, her sex discrimination claim fails.[10]

---

[10]Assuming arguendo Plaintiff presents sufficient evidence to establish a prima facie case of sex discrimination, she fails to show that Defendant's legitimate, non-discriminatory reason for her termination, that is her continued poor performance, is actually pretext for a discriminatory reason. Plaintiff argues that "it is clear that the reasons evidence [sic] against the Plaintiff was contrived." Pl. Response 26. However, Defendants do not rely on one or a handful of mistakes or poor performance by Plaintiff over a short period of time as the reason for her termination. Rather, concerns over her performance were documented beginning in March of 2009 and continued throughout her employment by more than one supervisor. Further, she was on probation for two

C.    **Hostile Work Environment**

Title VII prohibits an employer from subjecting an employee to a hostile work environment because of the employee's protected class. 42 U.S.C. § 2000e–2(a)(1). To survive a motion for summary judgment on a claim of a racially hostile work environment in violation of Title VII, a plaintiff must show that there is a genuine issue of material fact as to whether the offending conduct was 1) unwelcome, 2) based upon the protected class, 3) sufficiently severe or pervasive to alter the conditions of his employment and create an abusive work environment, and 4) imputable to his employer. Ziskie v. Mineta, 547 F.3d 220, 224 (4th Cir.2008).

In her deposition, Plaintiff testified that Williford created a hostile work environment by requiring her and another female employee in the procurement department to work in the warehouse, a job for which she had no training.  Pl. Dep. 127-128.  To show that conduct was sufficiently severe or pervasive to create a hostile environment, Plaintiff must establish that the environment was "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." Faragher v. City of Boca Raton, 524 U.S. 775, 787, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 21–22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). Actionable harassment occurs when the workplace is "permeated with discriminatory intimidation, ridicule, and insult." Harris, 510 U.S. at 21. While this particular task may have been unwelcome, Plaintiff fails to show an environment that was permeated with discriminatory intimidation ridicule and insult.

---

years and was given several opportunities to improve her performance before her termination in March of 2013. No reasonable juror could conclude that the documentation of her numerous performance issues, occurring over the course of four years, was contrived by Defendant in an attempt to hide illegal sex discrimination.  Therefore, Plaintiff fails to establish pretext and summary judgment is appropriate.

When asked in her deposition "[o]ther than working in the warehouse, are you alleging in this lawsuit that there was any other way that the City had created a hostile work environment," Plaintiff responded "no." Pl. Dep. 128. However, in her response, Plaintiff argues that "the acts of the Defendant harassing the Plaintiff regarding printing copies, placing her in a closet without an exit and the actions of Williford as her supervisor created a hostile work environment not hurt feelings." Pl. Resp. 32. Plaintiff cites generally to her affidavit, but Plaintiff addresses none of these issues in her affidavit. Thus, she fails to present evidence sufficient to support a hostile work environment claim, and summary judgment is appropriate.

### D.    Retaliation

Title VII makes it an "unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). To establish a prima facie claim of retaliation in violation of Title VII, a plaintiff must show that "1) the employee engaged in protected activity; 2) the employer took adverse employment action against the employee; and 3) a causal connection existed between the protected activity and the adverse action." Munday v. Waste Mgmt. of North Am., Inc., 126 F.3d 239, 242 (4th Cir.1997). "The employer may then rebut the prima facie case ... by showing that there was a legitimate non-discriminatory reason for the adverse action ... after which the burden shifts back to the plaintiff to show that those reasons are pretextual." Id.

An employee engages in protected activity when she opposes "not only ... employment actions actually unlawful under Title VII but also employment actions [she] reasonably believes to be unlawful." EEOC v. Navy Fed. Credit Union, 424 F.3d 397, 406 (4th Cir.2005). Plaintiff argues

-20-

that she complained about being treated differently in her rebuttals to her performance evaluations. In response to the performance evaluation dated November 29, 2010[11], Plaintiff stated that, while she was told she could not work extra hours, nothing was said to male employees in the department who were working extra hours.  Pl. Aff. Ex. H (Entry 35-4) pp. 21, 23.  In the same response, she stated "my supervisor does not seem to get along with women as a supervisor very well but does not have a problem supervising men."  Pl. Aff. Ex. H (Entry 35-4) p. 23.   On September 19, 2012, Plaintiff submitted a rebuttal to the performance evaluation for the period between May 5, 2011, and May 5, 2012, in which she stated that men in the office were allowed to work flex half-days on Fridays and women were not.  Pl. Aff. Ex. H (Entry 35-4) p. 6.  Thus, she presents sufficient evidence to show that she engaged in protected activity.

However, she fails to show a causal connection between her protected activity and her termination.  "[A] causal connection for purposes of demonstrating a prima facie case exists where the employer takes adverse employment action against an employee shortly after learning of the protected activity." Price v. Thompson, 380 F.3d 209, 213 (4th Cir.2004). However, the temporal nexus between two events cannot provide proof of causation unless the "temporal proximity between an employer's knowledge of protected activity and an adverse employment action" was "very close." Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (internal quotation marks omitted).  Here, Plaintiff's latest complaint of disparate treatment occurred in her rebuttal dated September 19, 2012.  She was terminated on March 14, 2013.  In Clark, the Supreme Court did not define "very close," but cited cases where adverse employment action was taken three months and four months after the protected activity as insufficient proximity. See id. at

---

[11]It is not clear when this rebuttal was submitted.

273–74 (citing Richmond v. ONEOK, Inc., 120 F.3d 205, 209 (10th Cir.1997), Hughes v. Derwinski, 967 F.2d 1168, 1174–75 (7th Cir.1991); see also Shields v. Fed. Exp. Corp., 120 F.App'x 956, 963 (4th Cir.2005) (holding that three to four months was insufficient temporal proximity). While other relevant evidence may be used to support a claim of causal connection where temporal proximity is lacking, Lettieri v. Equant Inc., 478 F.3d 640, 650 (4th Cir.2007), Plaintiff has failed to proffer any such evidence. Therefore, she fails to show a causal connection between her termination and her complaints, and her retaliation claim fails.

## V.     CONCLUSION

In sum, Plaintiff has failed to present sufficient evidence to create a genuine dispute of fact as to whether the City intentionally discriminated against her, created a hostile work environment or retaliated against her in violation of Title VII. Accordingly, it is recommended that Defendant's Motion for Summary Judgment (Document # 24) be granted and this case be dismissed in its entirety.

 s/Thomas E. Rogers, III
Thomas E. Rogers, III
United States Magistrate Judge

June 26, 2015
Florence, South Carolina